[No. 52342–8.   En Banc.   December 3, 1987.]

Don Herron, et al, *Appellants,* v. KING Broadcasting
Company, et al, *Respondents.*

*Rovai, McGoffin, Turner, Larkin & Miller,* by *John A. Miller,* for appellants.

*Riddell, Williams, Bullitt & Walkinshaw,* by *Stephen E. DeForest,* for respondents.

DORE, J.—Appellants appeal the summary judgment dismissal of their defamation action. We hold that the story that respondents broadcast in the early evening newscast of December 1, 1978 was materially false, and that appellants presented sufficient evidence for a trial on the issue of actual malice. We reverse.

## FACTS

The background of this case was a racketeering scandal of proportions unprecedented in this state which attracted intensive media attention. On November 28, 1978 the Pierce County Sheriff and seven others were arrested on racketeering charges. In connection with those charges, there was a federal probe into a series of Pierce County arson fires. In addition to those stories, the media reported that a local bail bondsman and one of the persons arrested, Lamont Zemek, had been vacationing earlier that month with a local district court judge and the Prosecuting Attorney of Pierce County, Don Herron. Herron had practiced law in both the public and private sectors since March 1959, until he was elected as Pierce County Prosecuting Attorney in 1975. Before the racketeering scandal, and the news broadcast linking him to that scandal which is the subject of this lawsuit, Herron had never come under scrutiny by the local or Washington State Bar Associations.

Respondent Don McGaffin was a news reporter with KING Broadcasting Company, better known as KING TV Channel 5. On December 1, 1978, McGaffin wrote and broadcast on KING TV a story that is the subject of the instant suit.

Sometime in mid to late November 1978, McGaffin had received an anonymous telephone call stating that the Pierce County Prosecutor's Office was under investigation by the FBI for improper bail bond procedures. McGaffin tried to contact Herron, by phone and in person, but was unable to obtain an interview. During a visit to the prosecutor's office he had a brief discussion with Deputy Prosecutor Terry Sebring, who confirmed that the office was under investigation by the FBI regarding bail bond forfeitures. Sebring would not give more information, however, due to the continuing investigation. McGaffin's response was very hostile. Sebring swore in an affidavit as follows:

McGaffin then stepped very close within a foot of me with his face showing of anger and said, "You mean to tell me that you will not talk to me about bailbond procedures even in general?" I replied, "I have given you my statement. The records are public information in the Clerk's Office."

He then said, "what happens after the bench warrant is issue? [sic]" I replied, "You are asking me a question I am not discussing further." He then said with his face close to mine and lowered his voice, "You will regret doing this (indicating refusing to answer his questions). I will get you (could have been 'fix you'). Just watch the news".

Clerk's Papers, at 262–63. McGaffin's hostility was corroborated by witnesses to the scene, reporter Barbara Anderson and receptionist Maria Chantrey, who heard McGaffin's loud "parting shot": "Watch the (evening) news, Sebring". McGaffin denies any threat or animosity toward Herron.

McGaffin next interviewed the Pierce County Superior Court Clerk, who supplied statistics on bail bond forfeitures collected from local bondsmen. McGaffin also spoke briefly with at least one Pierce County judge about bond forfeitures.

McGaffin contacted former Pierce County Prosecutor Ron Hendry, and one of Hendry's former deputies, Douglas McBroom. In an election characterized as "unusually bit-

ter," Herron had defeated Hendry in 1974. McGaffin claims that they discussed bail bond forfeiture procedures as well as the contributions made by bail bondsmen to Don Herron's 1974 campaign, and that one of the two told him that approximately half of Herron's 1974 campaign contributions originated from bail bondsmen.

Neither Hendry nor McBroom believes he made such a statement. Although he remembers a discussion with McGaffin, Hendry cannot specifically recall whether they discussed bail bonds or bail bondsmen's contributions to Herron's campaign. Hendry was certain, however, that he did not tell McGaffin that "approximately half" of Herron's contributions came from bail bond interests because he knew otherwise. Hendry testified in a deposition as follows:

Q. Would you have told Mr. McGaffin that over half the money collected by Mr. Herron in his campaign to defeat you was supplied by the bail bond interests of Pierce County?
A. No.
Q. Would you have said approximately under one–half?
A. No.
Q. Okay, why wouldn't you have used those words?
A. My recollection from the campaign is that the bail bond contributions to Mr. Herron's campaign were in the neighborhood of $1,500.
Q. If Mr. McGaffin would have asked you how much you thought the bail bond interests would have contributed to Mr. Herron's campaign, what would you have told him? $1,500?
A. Yes.

McBroom similarly does not remember the topic of his conversation with McGaffin. Although he testified candidly that he had no specific recollection of whether or not he told McGaffin that Herron had raised a $120,000 campaign fund, he stated, "I certainly don't believe I told him that. I didn't know how much Mr. Herron raised at that point. I don't know if I ever knew how much Mr. Herron raised." Answering a question as to whether he told McGaffin or other reporters that over half or approximately half of Herron's campaign contributions came from bail bond

interests, McBroom responded similarly: "I don't think that I probably, I'm sure I didn't know."

McGaffin also looked at the Public Disclosure Commission's campaign contribution reports for Herron. The reports list contributors by name, and state the amount contributed next to each name. The reports reveal that the total contributions for Herron's 1974 campaign were approximately $38,000, of which only $825 was contributed by bondsmen. McGaffin could not have determined that approximately half of Herron's campaign contributions came from bail bondsmen from those reports.

McGaffin wrote a story which he read during the 5:30 p.m. newscast on December 1, 1978. It stated:

> The Prosecutor's office in Pierce County has . . . it has been confirmed that the FBI is being investigated by the Prosecutor's Office in Pierce County [*sic*]. The FBI agents are questioning the Chief Prosecutor, Don Herron, and his deputies about bail bond procedures. Bondsmen John Carbone and Ron Williams are two of the eight men arrested and charged by the Justice Department on racketeering charges this week. Carbone heavily contributed to Herron's election campaign four years ago and again in 1978. Also arrested for racketeering was Herron's close friend and vacation companion, Lamont Zemek. Zemek's ex–wife, Nina Zemek, is Herron's long–time administrative aide. The FBI wants to know how Herron and the Pierce County Prosecutor's Office collected forfeited bail bonds, particularly from bondsmen Carbone and Williams. That was confirmed for KING–5 News today when Deputy Prosecutor Terry Sebring told me that he could not discuss bail bond matters. He said it would be inappropriate because his department is being questioned by the FBI and other Justice Department officials. This is the way . . . this is what the FBI is looking at. Let's say you get arrested and charged with a felony down in Pierce County. Sources inside the Sheriff's Department told KING–5 News today the jail officials will urge you to call Carbone's bail bonding company. Say bail is set at $10,000. You don't have the $10,000. The bondsman, Carbone, for instance, will put up a bond . . . a piece of paper . . . for $10,000. You pay Carbone approximately $1,000 in fees. But if you skip

town, then what happens? At that point the prosecutor is supposed to file a motion in court demanding that your $10,000 bond be forfeited to the county. The judge signs the order. The prosecutor is then supposed to serve notice on the bail bondsman to produce the $10,000 which then goes into the Pierce County Treasurer's Office. That is what is supposed to happen, but if a prosecutor doesn't push the bail bondsman for forfeiture and he doesn't pay up, what happens? Do the judges know? Or check? No. The Clerk of the Court has no way of knowing. Records are organized in such a way that they can't know. Only the prosecutor knows. A deputy . . . or . . . plus a deputy or two. KING–5 News has learned that only 18 times since 1975 has bail been collected on forfeiture in all of Pierce County Superior Court and only 4 of those cases were handled by the Carbone bail bonding company. Once in '75 . . . three times in 1977. Bail bondsmen were irritated at the former Pierce County Prosecutor, Ron Hendry, for pushing to collect those forfeited bail bonds monies. They contributed approximately half of all campaign money collected by Don Herron, who then beat Ron Hendry in 1974.

Clerk's Papers, at 187–88.

The allegations in the story that a bondsman had "heavily contributed" to Herron's campaign in 1974 "and again in 1978," and that bail bondsmen "contributed approximately half of all campaign money collected by Don Herron . . ." are conceded to be false. The innuendo in the story that Herron was involved in the racketeering scandal and was not collecting bond forfeitures because his friends and campaign contributors were bail bondsmen is also false.

The story was rewritten and read again by a different broadcaster on the 11 p.m. newscast that same evening. Although the content was similar, this report included a statement that bail bond interests had contributed "approximately $50,000" to the campaign. KING destroyed the audio tapes of both broadcasts, but retained a video tape copy of the 5:30 p.m. newscast.

A variation of the story was subsequently printed in the December 2, 1978 edition of the Bremerton Sun. This story, attributed to McGaffin and obtained from the United Press

International wire service, indicated that former prosecutor Hendry had an aggressive record of forfeiture enforcement against bail bondsmen, and implied that his 1974 defeat by Herron was linked to Herron's bail bond support. The printed story also stated that "Herron collected a $120,000 campaign chest, about half of it coming from bail bond interests." Clerk's Papers, at 11. The report further stated that Herron's largest single contribution came from Nina Zemek, who was Herron's administrative assistant and former wife of bondsman Lamont Zemek, Herron's friend. United Press International no longer has a record of how it obtained the information which was printed by the Bremerton Sun.

Herron sued KING Broadcasting, McGaffin, and the Bremerton Sun for defamation. His complaint set forth five specific statements alleged to have been defamatory, all of which appeared in the printed article published by the Bremerton Sun.

After the expiration of the statute of limitation, Herron sought to amend the complaint to add United Press International as a defendant, but the amendment was dismissed as untimely. Herron then sought to amend the complaint to add statements made during the 11 p.m. newscast of December 1, including the statement that bail bond interests had contributed "approximately $50,000." The trial court denied the second requested amendment as untimely, ruling that because each newscast constituted a separate cause of action for defamation, the amendment could not relate back under CR 15(c) to the filing of the original complaint. The court then granted summary judgment in favor of all defendants, holding that Herron failed to make a prima facie showing of actual malice as to the Bremerton Sun, and a prima facie showing of material falsity as to McGaffin and KING Broadcasting. Herron appealed from these orders. The Bremerton Sun was subsequently dismissed from the appeal.

## RELATION BACK OF AMENDMENT

CR 15(c) allows an amendment to relate back to the date of the original pleading "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . ." An amendment stating a time–barred new cause of action is not allowed where the amendment involves an unrelated event occurring at a different time. *Olson v. Roberts & Schaeffer Co.*, 25 Wn. App. 225, 228, 607 P.2d 319 (1980).

At common law, each publication of a defamatory utterance (*e.g.*, each sale of a book) constituted a separate cause of action. R. Sack, *Libel, Slander* 91 (1980); *see Holden v. American News Co.*, 52 F. Supp. 24, 32 (E.D. Wash. 1943). Most jurisdictions have now adopted the "single publication rule," which states that any one edition of a book or newspaper, or any one radio or television broadcast, is a single publication. Restatement (Second) of Torts § 577A(3) (1981). We find the single publication rule the better reasoned rule in light of the modern realities of mass publication and broadcasts to wide audiences.

In this case, the amendment sought to add statements made on the 11 p.m. newscast, including the false statement that bail bond interests contributed "approximately $50,000" to Herron's election campaign. The 11 p.m. newscast was the result of a conscious independent act, using a new script and broadcaster, and so clearly constitutes a separate publication, even under the single publication rule. *See Libel, Slander,* at 92. The amendment does not relate back to the filing of the original complaint because the statements did not arise from the same conduct, transaction or occurrence set forth in the original complaint. CR 15(c). The trial court did not err in denying the amendment. The second broadcast is, however, evidence of KING's actual malice.

## DEFAMATION

A defamation plaintiff must establish four essential ele-

ments: falsity, an unprivileged communication, fault and damages. *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982). When the plaintiff is a public official and the allegedly defamatory statement concerns the plaintiff's public duties, the plaintiff must show that the defendant acted with actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964).

In order to overcome a defendant's motion for summary judgment, the public official plaintiff must present a prima facie case with convincing clarity. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). *Mark,* at 487; *see also Dunlap v. Wayne,* 105 Wn.2d 529, 534, 716 P.2d 842 (1986). Despite this heavy burden, as with ordinary summary judgment motions, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc., supra; Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 170, 736 P.2d 249 (1987). Here, it is indisputable that KING's broadcast was not privileged and that it severely damaged Herron in his professional reputation by associating him with racketeers. This opinion is therefore limited to the issues of material falsity and actual malice.

A
Material Falsity

A defendant in a defamation action may obtain summary judgment by showing that the story's "sting" is true. *Mark,* at 494. The "sting" is the gist of the story as a whole, and is only altered when "significantly greater opprobrium" attaches to the false statement than it would to the truth. *See Mark,* at 496. Inaccurate reporting is not defamatory unless by altering the "sting" it creates a materially different impression on the reader.

The trial court characterized the sting of the 5:30 p.m. newscast as: (1) a prosecuting attorney was under investigation concerning bail bond practices; (2) he had a close friend who was arrested with two local bondsmen; and

(3) he had accepted substantial sums from a bondsman to finance election campaigns. Since the trial court determined that all three of these items were true, it determined that the false statements about bondsmen contributing "approximately half" of Herron's election funds, with one contributing "again in 1978", did not make any appreciable difference in the impact, or "sting", of the broadcast.

Herron assigns error to the trial court's characterization, contending that the true "sting" was to implicate Herron in a criminal conspiracy, giving an overall impression that he bargained away his ethics and integrity in exchange for campaign contributions. We agree. In that context, the statement that "approximately half" of Herron's campaign contributions came from bail bondsmen carries significantly greater opprobrium than the more accurate figure: approximately 2 percent. The false statement thus affected the "sting" of the story itself. Herron has made a sufficient prima facie showing of material falsity to preclude summary judgment.

## B
### Actual Malice

■ A public official who sues for defamation may only recover damages upon a showing that the defamatory statement was made with "actual malice"—that is, made with knowledge of its falsity or with reckless disregard of its truth or falsity. *New York Times Co. v. Sullivan, supra* at 279–80. "Reckless disregard" means (1) a "high degree of awareness of . . . probable falsity", *Garrison v. Louisiana,* 379 U.S. 64, 74, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964); or (2) that the defendant "in fact entertained serious doubts" as to the statement's truth, *St. Amant v. Thompson,* 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *Tilton v. Cowles Pub'g Co.,* 76 Wn.2d 707, 722, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927 (1970).

The standard for determining "actual malice" is subjective, focusing on the defendant's belief in or attitude toward the truth of the statement, not the defendant's per-

sonal hostility toward the plaintiff. *Old Dominion Branch 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 281, 41 L. Ed. 2d 745, 94 S. Ct. 2770 (1974); *St. Amant v. Thompson,* 390 U.S. at 731; *Reader's Digest Ass'n v. Superior Court,* 37 Cal. 3d 244, 257, 690 P.2d 610, 208 Cal. Rptr. 137 (1984), *cert. denied sub nom. Synanon Church v. Reader's Digest Ass'n,* 106 S. Ct. 3307 (1986); *Herron v. Tribune Pub'g Co.,* 108 Wn.2d at 170–71. However, actual malice can be inferred from circumstantial evidence, including defendant's hostility or spite, the reporter's knowledge that his sources are hostile to the plaintiff or ignorant of the details concerning the situation in question, destroying notes after the complaint is served, failure to follow newspaper procedures for filing papers of inaccuracy, and failing to properly investigate. *See, e.g., Tavoulareas v. Piro,* 759 F.2d 90, 134–35 (D.C. Cir. 1985); *Reader's Digest,* 37 Cal. 3d at 257–58.

> Professions of good faith [by the defendant] will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant,* at 732.

Individual factors that evidence actual malice are not generally sufficient to establish actual malice. For example, hostility alone will not constitute actual malice. *McDonald v. Murray,* 83 Wn.2d 17, 19, 515 P.2d 151 (1973); *Reader's Digest,* 37 Cal. 3d at 258. A reporter's knowledge that his principal sources were hostile to the plaintiff will not of itself establish actual malice. *Rye v. Seattle Times Co.,* 37 Wn. App. 45, 53–55, 678 P.2d 1282, *review denied,* 102 Wn.2d 1004, *cert. denied,* 469 U.S. 1087 (1984); *Tilton v. Cowles Pub'g Co., supra* at 722–23. Nor will mere failure to investigate in itself be considered bad faith. *New York*

*Times,* 376 U.S. at 287; *St. Amant,* 390 U.S. at 733. Mistakes made in investigating a news story do not rise to the level of actual malice. *Time, Inc. v. Pape,* 401 U.S. 279, 292, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971); *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1090–91 (3d Cir. 1985). However, each of the above factors may be taken into account cumulatively as probative evidence of actual malice. *St. Amant,* at 732; *Herron v. Tribune Pub'g Co.,* 108 Wn.2d at 172.

Here, viewing the evidence in the record in a light most favorable to Herron, there is abundant circumstantial evidence of actual malice. McGaffin's exchange with Deputy Prosecuting Attorney Sebring was extremely hostile. McGaffin threatened to "get" Herron or his staff in a story he intended to broadcast on the evening news because he was angry at their failure to cooperate with his investigation. He then in fact did broadcast a story casting the prosecutor's office and specifically Herron in a very evil and criminal light in a story that contained inexplicable falsehoods. In addition, the general tenor of the story is hostile and even implies that Herron arranged court records to hide his illegal activities. *See Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2d Cir. 1969) (innuendo can be indicative of actual malice).

The evidence viewed in a light most favorable to Herron indicates that McGaffin fabricated important portions of the story he broadcast on KING TV. Neither Hendry nor McBroom believes he told McGaffin that approximately half of Herron's campaign contributions came from bail bondsmen. McGaffin's assertion that he looked at the Public Disclosure Commission records of contributions before his broadcast, combined with the fact that the figures he reported were wildly different from the actual figures in the Commission's records raises an issue of fact as to whether he fabricated the figures. Although the contributions list includes over 500 names, there were only a few recognizable bail bondsmen's names, and the amounts contributed appeared next to each name. McGaffin could not explain

why his news announcement stated that "approximately half" of Herron's campaign funds came from bail bond interests.

Moreover, although the statement in the 11 p.m. broadcast that Herron accepted $50,000 in bail bondsmen contributions is time–barred as a separate cause of action, it is evidence of a pattern of fabrication that the jury is entitled to consider in determining actual malice. *Goldwater,* at 337 (jury may consider totality of conduct to find actual malice).

There is evidence that McGaffin may have relied on sources he knew or should have known to be unreliable. McGaffin claims that either Hendry or McBroom told him that "approximately half" of Herron's campaign contributions were from bail bondsmen. However, because the 1974 election between Herron and Hendry was a bitter one, it is possible that (if Hendry or McBroom in fact gave him that information) McGaffin believed that both Hendry and McBroom were hostile to Herron. It is unclear from the record whether McGaffin had reason to doubt their information. Whether McGaffin knew that his sources were hostile to the plaintiff or ignorant of critical details was probative evidence of actual malice. *Tavoulareas v. Piro,* at 132.

Finally, it is unclear from the record whether the tape of both the 5:30 p.m. and 11 p.m. newscasts was destroyed out of sequence after the complaint was served.

In sum, a reasonable jury could look at several circumstantial yet probative factors to find that respondents published the statements with knowledge of their falsity or with reckless disregard as to their truth or falsity: the alleged threats that McGaffin would "get" the prosecutor's office; his review of public disclosure records; Hendry's and McBroom's denial of the "approximately half" of the money from bail bondsmen statement; his knowledge of the bitter 1974 election; and the possible improper destruction of the tape memorializing the news broadcasts. Herron has

presented sufficient evidence to make a prima facie showing of actual malice.

## CONCLUSION

Although CR 15(c) does not permit amendment to add a cause of action for the 11 p.m. newscast of December 1, 1978, the gist or "sting" of the 5:30 broadcast was itself materially false. While no single factor establishes actual malice, several factors are probative evidence of actual malice. A reasonable jury could find that these factors taken together show actual malice with convincing clarity. Herron was entitled to a trial on the merits on his defamation action.

Summary judgment of the Superior Court is reversed and the case is remanded for trial.

UTTER, BRACHTENBACH, DOLLIVER, CALLOW, and GOODLOE, JJ., concur.

DOLLIVER, J. (concurring specially)—While I continue to support the position of the majority, I am constrained to make a further observation on libel. A free press is certainly an essential and crucial ingredient of a democratic society. Editorial choice is the critical element and is justified by the need for the press to be free, not, as some would have it, simply a purveyor of some commodity called the "right to know". Nonetheless, the power to injure gravely or destroy a reputation by untrue statements is a particular danger and problem. Reputations can be destroyed by an untruth whether published or broadcast with actual malice or, as the dissent claims here, because there was "a hot news story, written and broadcast with the characteristic haste of a television reporter, which through some inadvertence contained an exaggeration in the amount of campaign contributions that a prosecuting attorney had received from bail bondsmen at past elections." Dissenting opinion, at 529. Actual malice or "inadvertence" is immaterial to the target of the report; if it is untrue, it can destroy.

Looked at in the context of the time and the nature of the case before it, the Supreme Court decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964) seems inevitable and appropriate. In any event, it is the law by which this court is bound. It seems to me, however, the *New York Times* rule is a blunt instrument which fails to address what I believe to be the major concern of plaintiffs in cases such as the one before us: the restoration of their reputation by a public admission from the press that it was wrong, and false material was published or broadcast about the plaintiff. The publisher or broadcaster should simply admit the error in a manner equally well publicized as the original untruth and apologize.

It seems to me this sort of admission by the press that it erred, is sorry, and retracts the false statements would be salutary. Add to this compensation to the plaintiffs for their legal costs, and the plaintiffs certainly would be better off than going through the agony of a trial and gaining a money judgment, regardless of its size. A money judgment, which perhaps is satisfying, will not restore a reputation. From the standpoint of the press, the admission from time to time that it was wrong and in fact did tell damaging untruths about people might enhance its position with the public.

I recognize this procedure is not the law, and, given what seems to be an insatiable appetite for legal combat, an unwillingness to admit a mistake, and obvious constitutional problems, I suppose it never will be. Furthermore, I fully agree with the dissent that "[s]ome erroneous statements are inevitable in free debate" and "must be protected if freedom of expression is to have the breathing space it requires." Dissenting opinion, at 544. But the law and rights declared by the constitution and protected by the courts are not the only means by which the fabric of a free society is woven and maintained. Fair dealing and the admission by persons, including reporters, editors and publishers, that they were wrong, even if the error was unin-

tentional, might encourage a much needed civility in our public discourse. It is worth a try.

CALLOW and GOODLOE, JJ., concur with DOLLIVER, J.

ANDERSEN, J. (dissenting)—I most strenuously dissent from the majority's reversal of the trial court's order dismissing this defamation action.

What the majority does in this case is to authorize the use of defamation law to impose civil sanctions upon expressions critical of a public official in connection with the conduct of his office. This flies directly in the face of our well established defamation law to the contrary. It also casts a menacing pall over all news reporting in this state and opens the door to repressive defamation actions by public officials against news media defendants.

Even stretching every possible factual inference in the record to its utmost, as the majority diligently does, the record before us utterly fails to establish a genuine issue of material fact as to "actual malice", an essential element of the plaintiff's[1] libel case. What occurred here was no more nor less than a hot news story, written and broadcast with the characteristic haste of a television reporter, which through some inadvertence contained an exaggeration in the amount of campaign contributions that a prosecuting attorney had received from bail bondsmen at past elections. Unquestionably, the news reporter took what is colloquially known as a "hard shot" at the prosecutor, but actionable defamation it was not.

As reporter Don McGaffin explained in the affidavit he filed:[2]

I believed at the time every part of the report which I broadcast was factual. I had no doubts. I do not make

[1]The plaintiffs herein are both Don Herron and Patricia Herron, husband and wife. For purposes of convenience, however, I will herein refer to Mr. Herron as though he is the sole plaintiff.

[2]Appellant's Clerk's Papers, at 185–86.

anything up; I reported the facts as I knew them. I strive to be accurate, because that is the essence of responsible journalism. After this lawsuit was filed, which was two years after the broadcast itself, I learned the Public Disclosure Commission records showed that while bail bondsmen had been substantial contributors to the Herron campaign, they had contributed far less than approximately half of the contributions reported by Herron. Consequently, the statement in my broadcast that approximately half of the 1974 campaign contributions to Mr. Herron had been made by bail bondsmen is not accurate. If I had had any doubts about the accuracy of the facts which I broadcast, I would not have broadcast them.

Public officials such as the plaintiff cannot successfully sue their critics for defamation unless they can prove not only that the statements were false, but also that they were made with "actual malice", that is, with knowledge that they were false or with reckless disregard of whether or not they were false.[3]

As to the *"falsity"* element, this court in *Mark v. Seattle Times,* 96 Wn.2d 473, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982) stated that "[i]t is *not* the law, however, that every misstatement of fact, however insignificant, is actionable as defamation" (italics mine)[4] and, further, that "a defamation defendant need *not* prove the literal truth of every claimed defamatory statement." (Italics mine.)[5] In *Mark,* the court then went on to hold:

A defendant need only show that the statement is *substantially true or* that *the gist of the story, the portion that carries the "sting", is true.*

---

[3]*New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964); *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 169, 736 P.2d 249 (1987); *Rye v. Seattle Times Co.,* 37 Wn. App. 45, 53, 678 P.2d 1282, *review denied,* 102 Wn.2d 1004, *cert. denied,* 469 U.S. 1087 (1984).

[4]*Mark v. Seattle Times,* 96 Wn.2d 473, 493, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982).

[5]*Mark,* at 494.

(Italics mine.)[6] The court in *Mark* then proceeded to apply this rule, holding that the extent of the inaccuracy there involved "does not alter the 'sting' of the publication as a whole and does not have a materially different effect on a viewer, listener, or reader than that which the literal truth would produce."[7]

In the case before us, the learned and experienced trial judge who presided over the proceedings in the trial court scrupulously followed these well established legal principles in dismissing the plaintiff's defamation action on the defendants' motion for summary judgment. After first observing the applicable summary judgment principles, the trial judge ruled as follows:[8]

> In respect to the case against the defendants King Broadcasting and McGaffin, I agree with the defendants' argument that the court is limited to what was stated by Mr. McGaffin in his 5:30 broadcast. The motion to amend to add an additional claim based upon a later broadcast has twice been denied and these defendants would not be responsible for what was reported in the Bremerton Sun. On a prima facie basis plaintiff has established that in the 5:30 broadcast it was stated that bail bondsmen contributed "approximately half of all the campaign money" collected by plaintiff in 1974 and that Carbone contributed heavily "again in 1978", both of which statements are untrue. Whether Carbone "heavily" contributed to plaintiff's campaign and whether "only the prosecutor knows" about uncollected bail forfeitures are expressions of opinion. Therefore plaintiff's case necessarily depends upon the first two comments mentioned. Assuming that McGaffin did in fact state that bail bondsmen contributed "approximately half" of plaintiff's campaign money and th*at* Carbone contributed heavily "again in 1978" and that the quoted words are false, has plaintiff a prima facie case of defamation?

In *Mark v. The Seattle Times*, 96 Wn.2d 473, at 494,

---

[6]*Mark*, at 494.

[7]*Mark*, at 496.

[8]Memorandum Decision, at 3–6 (part).

the Supreme Court ruled as follows:

"It is now generally agreed that a defamation defendant need not prove the literal truth of every claimed defamatory statement. W. Prosser, *Torts* 798 (4th ed. 1971). A defendant need only show that the statement is substantially true or that the *gist of the story, the portion that carries the 'sting', is true.* W. Prosser, supra."

The broadcast of defendant McGaffin was essentially that certain individuals including two bail bondsmen had been arrested, that one of the bail bondsmen had contributed substantially to plaintiff's election as prosecutor, that a friend and vacation companion of plaintiff was one of the people arrested, that the FBI was investigating the prosecuting attorney's office in respect to its practices in respect to bail bonds, that a specific limited number of bail bond forfeitures had been collected since 1975, and that bail bondsmen were irritated at the former prosecutor who was defeated by plaintiff in 1974. The gist or the "sting" of the broadcast was that a prosecuting attorney was being investigated in respect to practices concerning bail bonds, that he had a close friend who was arrested with two local bondsmen, and that he had accepted substantial sums from a bondsman to finance election campaigns, all of which is conceded to be *true.* Whether bondsmen contributed "approximately half" of plaintiff's campaign money and whether one of them contributed "again in 1978" does not appear to make any appreciable difference in the impact of the broadcast.

Normally it would be expected that the weight or impact of evidence would be for a jury to consider and not a proper matter to rule upon in connection with a motion for summary judgment. However, in the *Mark* decision, citing several cases from other states, the Supreme Court upheld the summary dismissal of plaintiff's case because the inaccuracies in the defendants' reports did not materially affect the "sting" of the published reports.

In summary, . . . the motions of the defendants King Broadcasting and McGaffin for summary judgment will be granted because the plaintiff has failed to make a sufficient prima facie showing of material falsity as required by *Mark v. The Seattle Times, supra.*

(References to the defendant Bremerton Sun, which has

been dismissed as a party to this appeal, are deleted.)

I would hold that the trial court was absolutely correct in ruling that the gist of the story, the portion that carried the sting, was true, and in then dismissing the plaintiff's case. Even the majority concedes that "[t]he background of this case was a racketeering scandal of proportions unprecedented in this state which attracted intensive media attention."[9] This scandal included alleged acts of attempted murder, arson, bribery, extortion, illegal gambling and prostitution.[10] Coming in the midst of this, the investigation of the plaintiff (then Pierce County's chief legal officer) by the FBI and Department of Justice for possible wrongdoing was a highly newsworthy event.[11] This was just 3 days after the arrest on federal racketeering and extortion charges of that county's chief law enforcement officer, Sheriff George Janovich, along with several others including two Pierce County bail bondsmen, John J. Carbone and Ron Williams. The Carbone Bail Bond Company was a substantial contributor to the plaintiff's election campaign.[12] The plaintiff had also vacationed earlier that same month in Mexico with one of the men arrested, a friend whom he knew to have a criminal record, and whose ex–wife was employed in plaintiff's office as an administrative aide.

By ruling as it does, the majority flatly disregards this court's unanimous and recently established precedent in

---

[9]Majority opinion, at 515.

[10]See *United States v. Janovich,* 688 F.2d 1227 (9th Cir. 1982); *United States v. Zemek,* 634 F.2d 1159 (9th Cir. 1980), *cert. denied,* 450 U.S. 916, 985, 452 U.S. 905 (1981); *Anderson v. Janovich,* 543 F. Supp. 1124 (W.D. Wash. 1982); *Janovich v. Herron,* 91 Wn.2d 767, 592 P.2d 1096 (1979).

[11]See generally *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 736 P.2d 249 (1987); *Herron v. McClanahan,* 28 Wn. App. 552, 625 P.2d 707, *review denied,* 95 Wn.2d 1029 (1981).

[12]Of the 500 contributors to plaintiff's 1974 campaign, no more than 9 were larger than that of the Carbone Bail Bond Company. *See* Miller affidavit; exhibit 3.

*Mark.* The inaccuracies that crept into the reporting of KOMO–TV and KIRO–TV in *Mark* were *greater* than those of KING–TV in this case, yet in *Mark* those inaccuracies were held *not* to preclude a summary judgment dismissing the libel complaints.

In *Mark,* the defendant, a Seattle pharmacist, was *charged* with defrauding the State of Washington of an amount "greater than $75". The *probable cause affidavit* filed with the charge (and which was held to be qualifiedly privileged) referred to the amount involved as "over $200,000". At trial, however, the State proved the *actual amount* involved to be only "about $2,500". Stories, together with sensational headlines and leads, were written or broadcast by several newspapers and television stations, all of which were thereupon sued by Mr. Mark. KOMO–TV had broadcast that $300,000 and $350,000 was involved in the fraud. This was $100,000 and $150,000 greater than the amount stated in the probable cause affidavit and 40 and 60 times greater than the actual amount involved.[13] KIRO–TV, in several broadcasts, had reported that the defendant had been *charged* with defrauding the State of $200,000. This was 2,667 times the actual amount charged.[14]

A comparison of the news story errors in this case with the errors in the two cases relied on in *Mark* as authority for its ruling is also informative. One of those cases involved a newspaper article wherein the headline declared that the defendant was charged with a $168,000 theft, whereas the actual amount was only $6,655 and the criminal charges were subsequently dismissed entirely.[15] In the other case relied on in *Mark,* the headline read "Raid on House Finds Thousands in Jewelry", whereas the actual value of the jewelry found was only $500, and criminal

---

[13]*Mark,* at 494.

[14]*Mark,* at 494.

[15]*Dudley v. Farmers Branch Daily Times,* 550 S.W.2d 99 (Tex. Civ. App. 1977); *see Mark,* at 495–96.

charges were never filed at all.[16] In the latter case, the court observed, in dismissing the burglary suspect's defamation claim, that "in an arrest for burglary it would make no great difference what value the items bore. The sting of the article is the arrest of plaintiff suspected of burglary."[17]

So it is here that the inaccuracies in the amounts or percentage of contributions by bail bondsmen in the news broadcast undoubtedly had no great effect on the impact of KING–TV's news story. Or, to use the terminology in *Mark,* the inaccuracies could not have had a materially different effect on the viewer or listener than that which the literal truth would have produced. The majority's ruling in this case becomes even more incomprehensible when it is considered that here, unlike in the cases discussed above, the plaintiff was a *public official.* "Where public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it."[18] Nothing could be more clear than that the freedom of the people to discuss public affairs and public officials is precisely the kind of speech that the First Amendment and article 1, section 5 of our state constitution aim to keep within the area of free and open discussion.[19] I would hold that the "sting" of the story was unaffected by Mr. McGaffin's exaggeration of the bail bond contributions and that the plaintiff has failed to make a prima facie showing of material falsity.

Turning from that aspect of the case to the next, I would hold further that plaintiff failed to make the showing of *actual malice* required in a defamation action brought by a

---

[16]*Turnbull v. Herald Co.,* 459 S.W.2d 516 (Mo. Ct. App. 1970); *see Mark,* at 494–95.

[17]*Turnbull,* at 519; *see Mark,* at 495.

[18]*New York Times Co. v. Sullivan,* 376 U.S. 254, 302, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964) (Goldberg, J., concurring), citing W. Douglas, *The Right of the People* 41 (1958).

[19]*See New York Times,* 376 U.S. at 275.

public official.

In order to reverse the trial court's dismissal of the plaintiff's defamation action in this case, the majority weaves a gossamer web of possibilities intertwined with "ifs" and "maybes", then terms it "abundant circumstantial evidence of actual malice".[20] To subscribe to this approach to the law concerning libel of public officials is to recognize a de facto rule compelling all critics of official conduct to henceforth guarantee the truth of any factual assertion on pain of a potentially ruinous defamation judgment. That is not the intention of defamation law and never has been except possibly in foreign countries such as, for example, England where the king or queen are sovereign and the people are subjects of the crown. Under our constitution, it is the other way around; the people are sovereign and it is the public officials who work for the people.

The inherent vice in the majority's viewpoint is that "[u]nder such a rule, would–be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."[21] That, of course, is precisely what the proof of "actual malice" rule was designed to prevent.[22] It is difficult for me to perceive anything more obviously violative of the press freedoms guaranteed by the first amendment to the United States Constitution and article 1, section 5 of the Washington State Constitution, than to compel a news media defendant to go to trial where there is no more evidence of actual malice than has been presented here.[23] When the possibilities and "ifs" and "maybes" which the majority relies on in claiming that

---

[20]Majority opinion, at 525.

[21]*New York Times,* 376 U.S. at 279.

[22]*See New York Times,* 376 U.S. at 279–80.

[23]*See New York Times,* 376 U.S. at 282.

actual malice exists are closely examined, they simply do not stand up as "material facts" sufficient to defeat the defense motion for summary judgment.

Cutting through to the essence of the majority's position, it relies on testimony that Don McGaffin acted in a "hostile" manner when he visited the prosecutor's office and (according to one of plaintiff's deputies) said he would "get" him. Aside from the fact that the plaintiff was not present and the three people in the room other than the deputy prosecutor (including the plaintiff's own receptionist) do not recall any such statement having been made, that statement is the only concrete evidence which might indicate actual malice and it is insufficient to do so. A similar claim was rejected in the case of *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987). *Tavoulareas* is particularly significant because it is a very recent 7–to–1 opinion by the full District of Columbia Circuit Court of Appeals which overruled a 2–to–1 contrary decision by a panel of that court. Comparing the remarks made by the reporter in that case to the remarks claimed to have been made by Don McGaffin to the deputy prosecutor, Don McGaffin's remarks are equivalent to an invitation to a Sunday school picnic. In *Tavoulareas,* it was also claimed that a reporter for the Washington Post planned to "get" the plaintiff, who was president of a major oil company, and that this constituted evidence of actual malice. Evidence was presented to the court that the reporter had said: "[i]t is not every day you knock off one of the seven sisters," (*i.e.,* one of the seven largest oil companies); that the Post "blew [the plaintiff] out of the water" and sent him home with his "tail between his legs"; and then inquired of another party if "he knew of a family member who would rifle [plaintiff's] safe and [x]erox documents".[24]

The court in *Tavoulareas* agreed that the last remark was obviously offensive, but even in view of that, held that "[t]he ill–will or bad–motive evidence in this record, how-

---

[24]*Tavoulareas v. Piro*, 817 F.2d 762, 795–96 (D.C. Cir. 1987).

ever, is lacking in probative value".[25] In affirming the trial court's dismissal of the plaintiff's libel action, it held as follows:

> These statements, not unknown to the vernacular of litigators, seem to us well within the everyday parlance of an *investigative* reporter. They may reasonably be interpreted as revealing that [the reporter] had adopted an adversarial stance toward [the plaintiff]. But, as in other professions, an adversarial stance is fully consistent with professional, investigative reporting. It would be sadly ironic for judges in our adversarial system to conclude, . . . that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts. We decline to take such a remarkable step in First Amendment jurisprudence.

*Tavoulareas,* at 795.

As the court in *Tavoulareas* explained,

> It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice. . . . The appropriateness of such evidence must be determined on a case–by–case basis, bearing in mind that evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith.

(Footnote and citations omitted.) *Tavoulareas,* at 795.

We recently reached a similar conclusion in affirming the dismissal on summary judgment of this same plaintiff's libel action against the publisher of the Tacoma New Tribune:

> It is by now well established that the "actual malice" element of public figure defamation claims is not ill will or spite but rather the publisher's knowledge that his statements are false or his reckless disregard for their falsity. The purpose behind this imposing plaintiff's hurdle is the protection of First Amendment rights and values.
> For speech concerning public affairs is more than self–

---

[25]*Tavoulareas,* at 795.

expression; it is the essence of self–government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide–open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."
*Garrison* [*v. Louisiana,* 379 U.S. 64,] 74–75 [13 L. Ed. 2d 125, 85 S. Ct. 209 (1964)] (quoting *New York Times Co. v. Sullivan,* [376 U.S 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964)]); . . . The actual malice standard serves the First Amendment in part by shielding the right to criticize public figures from restrictions based on the speaker's motive.

(Citations omitted.) *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 170–71, 736 P.2d 249 (1987). Thus, the "I'll get you" remark does not show "actual malice" even if, as the majority assumes, it was directed to the plaintiff and not to the deputy to whom Don McGaffin was speaking at the time.

The majority opinion also states that the news story "contained inexplicable falsehoods" and that "McGaffin's assertion that he looked at the Public Disclosure Commission records of contributions before his broadcast, combined with the fact that the figures he reported were wildly different from the actual figures in the Commission's records raises an issue of fact as to whether he fabricated the figures."[26] I do not see that it raises any such issue. At no time did the reporter ever suggest, or was it shown, that he knew either the occupations of all of the plaintiff's 500 listed contributors or who among them were bail bondsmen. What the majority does by these and similar statements is to impose a duty on news reporters to investigate and search out the actual truth of everything they report. The law is otherwise; there is no such duty.[27]

As further evidence of fabrication, the majority points to

---

[26]Majority opinion, at 525.

[27]*Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 171, 736 P.2d 249 (1987).

the Hendry and McBroom denials that they told McGaffin that bail bondsmen contributed approximately half of plaintiff's campaign funds in 1974. The record reveals that these denials were far more tentative than the majority suggests. As Ronald Hendry stated, "I honestly don't remember much about the conversation at all other than that he, as well as a number of people, were calling during that period of time."[28] Neither could Douglas McBroom recall the specifics of a 3–year–old conversation. "I don't specifically recall telling anyone that and I don't specifically recall not telling anyone that."[29] I simply cannot see how such vague recollections and speculations about what might or might not have been said to a reporter 3 years earlier can in fairness be categorized as probative evidence of actual malice or deliberate falsification.

As additional evidence of actual malice, the majority points to "evidence" that Mr. McGaffin *may have* relied on sources he knew to be unreliable. One such claimed piece of evidence is the *possibility* that McGaffin believed Ronald Hendry and Douglas McBroom, McGaffin's principal sources, were hostile to the plaintiff. Ronald Hendry was defeated in the 1974 prosecuting attorney's race by the plaintiff, and Douglas McBroom was Hendry's chief criminal deputy before that defeat. The majority points to nothing in the record to show that these two men were biased, finds no patent reason to doubt their stories and does not suggest that the two men had a reputation for untruthfulness, thus rendering their stories suspect.[30] In fact, McBroom testified in his 1981 deposition that the campaign between Hendry and Herron would have been irrelevant by the time he talked to McGaffin. "By 1978 I didn't, you know, have any emotional bent one way or the other. It

---

[28]Deposition of Ronald Hendry, at 9.

[29]Deposition of Douglas McBroom, at 21.

[30]*See Tilton v. Cowles Pub'g Co.*, 76 Wn.2d 707, 723, 459 P.2d 8 (1969), *cert. denied*, 399 U.S. 927 (1970).

pretty well dissipated."[31]

Indeed, in direct contradiction to the majority's uncertain assertion that "McGaffin *may* have relied on sources that he knew or should have known to be unreliable" (italics mine) is McGaffin's statement that he believed the people he talked to—a county clerk, a judge, the former prosecuting attorney, the former deputy prosecuting attorney, and the present deputy prosecuting attorney—were people "whom I considered to be reliable and knowledgeable".[32] This statement and the foregoing clearly, in my judgment, contradict the majority's untenable conclusion that "[i]t is unclear from the record whether McGaffin had reason to doubt their information."[33]

I now turn to the *distinctive summary judgment rules* which are applicable to cases of this kind. Because protection of basic First Amendment rights and values are involved in defamation cases brought by public officials against news media defendants, different summary judgment rules are applicable than in other types of cases. A "heavier burden" is imposed on the plaintiff in such cases than in others. As we recently observed when we unanimously affirmed the dismissal of plaintiff's defamation action against the Tribune Publishing Company,

> When a defamation claim is brought by a public official regarding statements made about the official's performance of his public duties, the plaintiff must prove that the statements were made with actual malice. The burden of proof for the element of actual malice is "clear and convincing evidence", not the less stringent "preponderance of the evidence" burden ordinarily required in civil suits. This heavier burden is imposed at the summary judgment stage as well as at trial; to survive a defendant's summary judgment motion for dismissal, the plaintiff must offer evidence sufficient to permit a rea-

---

[31]Deposition of Douglas McBroom, at 12.

[32]Appellant's Clerk's Papers, at 185.

[33]Majority opinion, at 526.

sonable trier of fact to find clear and convincing proof of actual malice. As with other summary judgment motions, the nonmoving party is entitled to have the evidence viewed in a light most favorable to him and against the moving party. However, if the plaintiff, as nonmoving party, can only offer a "scintilla" of evidence, evidence that is "merely colorable", or evidence that "is not significantly probative", the plaintiff will not defeat the motion. Moreover, conclusory statements in a plaintiff's affidavit are insufficient; the plaintiff must demonstrate the basis for his assertions. The inquiry before this court, then, is whether, in viewing all the evidence in a light most favorable to the Herrons, a reasonable trier of fact could find clear and convincing proof that the defendants published their articles with actual malice.

(Footnote and citations omitted.)[34] For the reasons which I have discussed above in some detail, when viewing the evidence presented by the plaintiff in the light most favorable to him, I fail to see how any reasonable trier of fact could find what was presented here to be *clear and convincing proof* that the defendants broadcast the news story with *actual malice.* As the United States Supreme Court instructs, actual malice consists of, for example, evidence establishing that a story was fabricated, so improbable that only a reckless man would have put it in circulation, or based wholly on an unverified anonymous phone call or some other source that the defendant had obvious reasons to doubt.[35] The plaintiff has shown nothing whatsoever that even remotely resembles such evidence. Plaintiff's "evidence" of actual malice is merely colorable and is not of significant probative value. As a matter of law, I would hold that it is insufficient.

---

[34]*Herron v. Tribune Pub'g Co.*, at 169–70. *Accord, Rye v. Seattle Times Co.*, 37 Wn. App. 45, 678 P.2d 1282, *review denied*, 102 Wn.2d 1004, *cert. denied*, 469 U.S. 1087 (1984).

[35]*St. Amant v. Thompson*, 390 U.S. 727, 732, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *see also Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987).

Finally, in cases such as this, we are also charged with the obligation of *independent appellate review*. Our obligation in this regard was recently reaffirmed by the United States Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–11, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984):[36]

> It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common–law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—*must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of* "actual malice."

(Italics mine.) In *Bose*, the United States Supreme Court also again approved the principle that there is a "significant difference between proof of actual malice and mere proof of falsity". *Bose,* at 511. So viewed, the plaintiff has totally failed to offer evidence of actual malice with the constitutionally required convincing clarity.

What this case is really all about is the right of self–government—the right of the people to govern themselves. Government of the people, by the people, and for the people is still the sovereign definition of democracy. How can the people be expected to knowledgeably exercise their right to self–government unless they know how their public officials are fulfilling their public trust?

---

[36]*Accord, Bartimo v. Horsemen's Benevolent & Protective Ass'n,* 771 F.2d 894, 896 (5th Cir. 1985), *cert. denied,* 106 S. Ct. 1635 (1986); *Levine v. CMP Publications, Inc.,* 738 F.2d 660, 674 (5th Cir. 1984); *Foodscience Corp. v. McGraw–Hill, Inc.,* 592 F. Supp. 362, 366 (D. Vt. 1984).

544

What is to be protected, of course, is "speech", not the news media as such. For speech concerning public affairs is more than self–expression; it is the essence of self–government.[37] Our forebears who wrote and ratified our federal and state constitutions gave the news media the protection it must have so that it can fulfill its essential role in our democracy.[38] Historically, part of that role has always been engaging in debate on public issues. It is well recognized and fundamental that such debate must be uninhibited, robust and wide open, and able to accommodate even vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.[39] The television commentary in this case is well within this protected zone. Some erroneous statements are inevitable in free debate, but it is likewise well established that they, too, must be protected if freedom of expression is to have the breathing space it requires.[40]

The bottom line is that without an informed and free press, there cannot be an enlightened people; and without an enlightened people, democracy has but little chance to survive in an often hostile world.[41] Surely, more should be required before these precious rights are whittled away than that one news reporter's rhetoric outrage the sensibilities of a few. The majority opinion is a step in the wrong

[37]*Garrison v. Louisiana,* 379 U.S. 64, 74–75, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964).

[38]*See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 381–82, 37 L. Ed. 2d 669, 93 S. Ct. 2553 (quoting *New York Times Co. v. United States,* 403 U.S. 713, 717, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (Black, J., concurring)), *reh'g denied,* 414 U.S. 881 (1973).

[39]*New York Times,* at 270; *Garrison,* at 74–75.

[40]*New York Times,* 376 U.S. at 271–72.

[41]*See New York Times Co. v. United States,* 403 U.S. at 728 (Stewart, J., concurring).

direction in the cause of speech and press freedoms. For these reasons, I dissent.

PEARSON, C.J., and DURHAM, J., concur with ANDERSEN, J.

Reconsideration granted July 12, 1988.