[No. 10406–3–I. Division One. March 12, 1984.]

EDDIE RYE, JR., ET AL, *Respondents*, v. SEATTLE TIMES COMPANY, ET AL, *Petitioners*.

46

*Davis, Wright, Todd, Riese & Jones, Daniel M. Waggoner,* and *Evan Schwab,* for petitioners.

*Lembhard Howell,* for respondents.

ANDERSEN, J.—

## FACTS OF CASE

This is a defamation action brought by the plaintiffs, Eddie Rye, Jr., and wife, against the defendants, Seattle Times Company (publishers of The Seattle Times) and its reporter, Richard Anderson and wife.[1] The trial court denied defendant's motion for summary judgment of dismissal. Thereafter, this court granted discretionary review of that decision. RAP 2.3(b)(1).

The following facts are essentially undisputed.

The May 3, 1978 article on which this defamation action is based was written by the defendant Rick Anderson and published in The Seattle Times. It reads as follows:

---

[1]For purposes of convenience, Mr. Rye will be referred to herein as though he is the sole plaintiff and Mr. Anderson will be referred to as though he is the sole individual defendant.

*Cash, drugs to officials*
## Ex–CAMP employes tell F.B.I. of kickbacks
### by RICK ANDERSON

Federal authorities have been told of a series of kickbacks involving money and illegal drugs at Seattle's Central Area Motivation Program, The Times has learned.

The Federal Bureau of Investigation has been given direct information from former CAMP employes who admitted giving the kickbacks and said others witnessed some of the transactions.

Six specific incidents resulted in $1,100 in cash and $200 in cocaine going to a CAMP official, the F.B.I. was told.

The kickbacks were given in return for "job security," one employe said.

Another said a $200 kickback was given to an official as a "share" of some excess federal funding at the public antipoverty agency.

The kickbacks were given at different times during 1976 and 1977, and at one point required the alteration of a personal contract to produce money one official said he wanted, the F.B.I. was told.

AN EMPLOYE, a consultant working on contract, said he was told to rewrite the contract, doubling his monthly pay.

Doing so increased his salary from $600 to $1,200, he said. The excess from that month, in the summer of 1977, was then given to the official who had asked that the contract be rewritten.

The $600 excess was given in two $300 payments, made in cash to the official in his office, the employe said.

CAMP public records show that the employe, who had been contracted at an annual salary of $7,200 ($600 a month), actually received $7,800 in 1977.

An earlier cash payment of $300 was made from money resulting from an official request to increase a special hourly consultant's fee on a CAMP project sponsored by federal funds, the F.B.I. was told.

In that instance, early in the summer of 1977, the employe said he asked the official why he thought the hourly rate was too low.

"It's too low because I need $300," the employe said the official responded. Although the work had already been completed, the hourly rate was increased and a bill-

ing put through. When it was paid, the $300 was given in cash by the employe to the official in the men's room of a Seattle cafe.

Two OTHER kickbacks resulted in separate drug transactions in 1977. An employe, as a result of an agreement with an official, received money for special work. In return, the employe told the F.B.I., he gave the official a total of two grams of cocaine, worth $100 a gram, purchased with the money from the special work. The cocaine (selling or possession of which is a felony) was agreed upon before the work was done, the employe said.

Another employe said he and one other CAMP worker agreed to divide some excess federal funding and were told that an official wanted part "of the action."

The two employes were uncertain if it was wrong to take the excess funding—it was being paid to them for work they did on another project, although they both were regularly salaried CAMP employes—but chose to give the official $200 in cash.

One of the employes and a witness were present when the official was given an envelope containing two $50 bills and a $100 bill in June, 1976.

At the time the article was written, the plaintiff was executive director of the Central Area Motivation Program, commonly referred to by the acronym CAMP, and had served in that capacity for several years. CAMP, an anti-poverty agency, served as a conduit through which federal and state funds were channeled to Seattle's central area. The plaintiff, in his capacity as CAMP executive director, had substantial responsibility for funds allocated to CAMP from governmental sources and exercised considerable discretionary authority in connection with directing the use thereof.

For the year or so preceding the writing and publication of the article in question, there had been a running controversy concerning CAMP. This appears to have resulted largely from governmental reports that CAMP was short of funds and from investigations of CAMP on the part of federal oversight agencies. Statements by CAMP employees and other individuals in the community contributed their views and opinions to the controversy.

Beginning in November of 1977, The Seattle Times published a series of articles on the controversy written by its reporter, Mr. Anderson, some of which involved the plaintiff and his role at CAMP. The articles detailed assorted CAMP matters including problems with a summer food program, irregularities in the handling and transfer of funds within CAMP and CAMP's general shortage of funds.

The sources of the reporter's information for his articles included the audits and reports of the oversight agencies and statements of persons who were or had been employed at CAMP, including a Mr. Mike Stillwell and a Mr. Jerrold Letnes. Mr. Stillwell had been head of the CAMP Consumer Action Project for 4 years and an employee of CAMP for a total of 6 years. Mr. Letnes had been a senior staff member and full–time CAMP employee from 1973 to 1976 with substantial involvement in seeking grants for CAMP, and subsequently operated his own consulting firm which did contractual work for CAMP.

According to the reporter, the information so provided him was both reliable and accurate. The reporter also said that he "did not believe that Letnes or Stillwell had personal animosity toward [the plaintiff], but believed they only wanted to insure that public funds were used properly."

In the reporter's affidavit filed in support of the defendant's motion for summary judgment he tells of a luncheon interview on which the article in question was primarily based. It took place the day before the article was published. Present were Messrs. Stillwell and Letnes, their attorney, the Times reporter Mr. Anderson and a reporter from a Seattle television station. As Mr. Anderson's affidavit relates:

15. At the lunch meeting Stillwell and Letnes described a recent visit to the FBI where they met with an agent after being granted immunity through the United States Attorney. Stillwell and Letnes informed me they had given the FBI the full details of the events

of CAMP and had admitted to giving Rye kick–backs totalling $1,100 in cash and kick–backs of cocaine. Stillwell and Letnes stated the kick–backs were given to Rye to insure that they would continue having jobs and that others had witnessed some of the kick–backs. They stated they had told the FBI that $300 in kick–backs had been given from an increase in a special hourly consultant's fee being performed by Letnes. They stated they had told the FBI that $300 had been given in cash to Rye in the men's room of a Seattle cafe.

16. I believed Letnes and Stillwell were telling me the truth. I understood they were admitting their own guilt and were "dirtying" themselves by admitting to their participation in such actions. After the story was published and this lawsuit was initiated, both Stillwell and Letnes confirmed to me that they still believed their allegations were true and that they had transmitted those allegations to the FBI.

The reporter's affidavit further related that he also confirmed with federal authorities that Messrs. Stillwell and Letnes had in fact made such charges against the plaintiff. Affidavits from Mr. Stillwell and Mr. Letnes to the foregoing effect were also filed in support of the defendant's motion for summary judgment.

According to his own deposition, the plaintiff was in charge of an organization that had as its function the administering of public funds and he was paid by federal moneys. In responding to the defendant's motion for summary judgment on the issue of liability, the plaintiff did not contest that he was a public official or public figure. He has offered the following argument as to why summary judgment should not be granted:

The evidence presented to the trial court, construed most favorable [sic] to the plaintiff, shows that Anderson had a running dialogue with Letnes and Stillwell since the early stages of the story in 1977. By mid–February, 1978, Letnes had been terminated by Rye, and Rye was trying to terminate Stillwell, a fact that Anderson must have been aware of in view of his regular communication with them. By mid–February Letnes and Stillwell were making public accusations against Rye. The Anderson

affidavit . . . states that he had no reason to doubt the accuracy of the information given him by Letnes and Stillwell, no reason to suspect that they were hostile to Rye, and even if he wanted to check the story with Rye, Rye had told him in March that he would provide no further comments. However, Stillwell and Letnes had been making public accusations against Rye long before May 3, 1981.

The conclusion to be drawn from these facts is that through a regular discourse of several months, Anderson was aware of what was going on between Letnes, Stillwell and Rye. They were not casual or one time sources for Anderson, but individuals Anderson had been dealing with for months. Being aware of what had been going on should have made Anderson question the veracity of the information. The fact that he did not mention any names in the offending article indicates that he did have certain reservations. Anderson had no problem using Rye's name in earlier articles on CAMP.

(Cross reference deleted.) Plaintiff's Response to Motion for Discretionary Review, at 9–11.

We are here presented with one basic issue.

## ISSUE

Did the trial court err in denying the motion of the newspaper and its reporter for a summary judgment dismissing this defamation action brought against them by the plaintiff who is a public official and/or a public figure?

## DECISION

CONCLUSION. The plaintiff did not make out a prima facie case by evidence of sufficient clarity that the allegedly defamatory publication was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The trial court, therefore, erred in not granting a summary judgment dismissing plaintiff's action.

■ Our summary judgment rule, CR 56(c), provides that a summary judgment is available only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." A

motion for summary judgment will be granted only if after considering all of the pleadings, affidavits, depositions and all reasonable inferences drawn therefrom in favor of the nonmoving party, a trial court determines that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *LaPlante v. State,* 85 Wn.2d 154, 158, 531 P.2d 299 (1975); *Balise v. Underwood,* 62 Wn.2d 195, 199, 381 P.2d 966 (1963).

The denial of a motion for summary judgment is not an appealable order. RAP 2.2(a). Discretionary review of such orders will not ordinarily be granted, *see Roth v. Bell,* 24 Wn. App. 92, 104, 600 P.2d 602 (1979), but can be granted in the relatively rare situations posited by RAP 2.3(b). Review was granted in the case before us on the basis of the latter rule, namely that "the superior court has committed an obvious error which would render further proceedings useless . . .", RAP 2.3(b)(1).

In *Mark v. Seattle Times,* 96 Wn.2d 473, 485, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124, 73 L. Ed. 2d 1339, 102 S. Ct. 2942 (1982), decided subsequent to the trial court's decision here under review, the State Supreme Court extensively reviewed the case law concerning the standard to be applied in granting summary judgment in defamation cases and concluded that

> *we adhere to the requirement that a defamation plaintiff resisting a defense motion for summary judgment must establish a prima facie case by evidence of convincing clarity.*

(Italics ours.) *Mark,* at 487. This defamation case summary judgment standard is particularly appropriate where, as here, the action is brought by public officials and/or public figures. *See Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 43, 515 P.2d 154 (1973).

The foregoing "new facet" of summary judgment proceedings in defamation cases, to use the terminology of *Chase,* is based on reasons of public policy predicated on the first amendment to the United States Constitution.

Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. . . .

In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. . . . Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self–censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide–open, for self–censorship affecting the whole public is "hardly less virulent for being privately administered." Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

(Some citations omitted.) *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied,* 385 U.S. 1011, 17 L. Ed. 2d 548, 87 S. Ct. 708 (1967).

*Mark,* at 484–85. *Accord, Tait v. KING Broadcasting Co.,* 1 Wn. App. 250, 255, 460 P.2d 307 (1969).

 It is, of course, the law that a "public official" or "public figure" may not recover damages for defamation unless he or she proves that the statement claimed to be defamatory "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). *Accord, Tilton v. Cowles Pub'g Co.,* 76 Wn.2d 707, 715, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927, 26 L. Ed. 2d 792, 90 S. Ct. 2238 (1970). There is no evidence in the record presented for review in this case that the reporter who wrote the article knew anything in the article was false. Rather, the question here is whether he wrote the article with reckless disregard for its truth or falsity.

 In opposing defendant's motion for summary judgment on the reckless disregard for truth or falsity issue, the

plaintiff showed that: Mr. Stillwell and Mr. Letnes told a third party, an attorney, that the plaintiff "was stealing millions from CAMP" and that "they were going to get [him]"; and, as the plaintiff stated at the time his own deposition was taken, Mr. Stillwell and Mr. Letnes were hostile to him because he had fired them. Considering this showing in light of the other arguments made by plaintiff as summarized above, and drawing all reasonable inferences favorable to the plaintiff therefrom, no more appears than that the reporter's two principal sources for the articles were hostile to the plaintiff. Even if we go further and consider that this showing circumstantially establishes that the reporter knew of the hostility of his sources, this is still insufficient to establish a prima facie case by evidence of convincing clarity that the reporter wrote his article with reckless disregard for its truth or falsity.

In point is the United States Supreme Court's decision in *St. Amant v. Thompson*, 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968). As there explained:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant,* at 731. *Accord, Tilton,* at 719. In that defamation action, St. Amant (the defendant) made a televised speech wherein he read statements made by his source which falsely accused the plaintiff Thompson (a public official) of criminal conduct. Furthermore, St. Amant had not verified the information given him by his source before using it. In ordering the defamation case against St. Amant dismissed, the Supreme Court held:

> By no proper test of reckless disregard was St. Amant's broadcast a reckless publication about a public officer. Nothing referred to by the Louisiana courts indicates an awareness by St. Amant of the probable falsity of Albin's

statement about Thompson. Failure to investigate does not in itself establish bad faith. *New York Times Co.* v. *Sullivan, supra,* at 287–288.

*St. Amant,* at 732–33.

Another pertinent decision is that of the State Supreme Court in *Tilton.* There the newspaper article which was alleged to be defamatory contained allegations of impropriety on the part of certain persons and organizations supporting a proposed change in the city government of Spokane from a city manager form to a strong mayor form. One of the issues involved in that action, as here, was whether the allegations in the article were written with reckless disregard for their truth or falsity. The court in *Tilton* held that the fact the jobs of two of the reporter's principal sources for his article would be in jeopardy if the form of Spokane's city government was changed, "hardly proves with convincing clarity that [the reporter] was aware of the probable falsity of his story." *Tilton,* at 723. The judgment for the plaintiff was there reversed and the case remanded with instructions to enter judgment for the defendant.

*See also Hotchner v. Castillo–Puche,* 551 F.2d 910, 913–14 (2d Cir.), *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 54 L. Ed. 2d 95, 98 S. Ct. 120 (1977) (publisher's knowledge of author's ill will toward plaintiff held insufficient by itself to prove knowledge of probable falsity); *Loeb v. New Times Communications Corp.,* 497 F. Supp. 85, 92–93 (S.D.N.Y. 1980) (reporter's failure to verify with plaintiff information obtained from biased source insufficient to establish reckless disregard of the truth).

At the time of oral arguments before this court, the plaintiff submitted a 10–page statement of additional authorities and new arguments. The rule permitting the furnishing of additional authorities to the court does not authorize a party to file an additional appellant's or respondent's brief, but is confined to permitting a party to "file a statement of additional authorities, *without*

*argument"*. (Italics ours.) RAP 10.8.[2]

Under the circumstances of this case, however, we deem it necessary to observe that with respect to *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979) and other authorities of like effect cited therein for the proposition that when a defendant's state of mind is in issue the case does not readily lend itself to summary disposition, the State Supreme Court has recently observed:

Where "actual malice", that is, a defendant's state of mind is at issue, the United States Supreme Court in dicta has recently called into question the frequent state practice of summary disposition in such cases. *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979). Nonetheless, the general rule appears to require that plaintiff must produce some affirmative evidence to indicate that malice existed, or the court will grant summary judgment. 10 C. Wright & A. Miller, *Federal Practice* § 2730, at 590–92 (1973), and cases cited therein.

*Mark v. Seattle Times,* at 486 n.3 (part).

Furthermore, the most recent edition of an authoritative text on this subject concludes its discussion of this issue as follows:

Actions that involve questions of malice often are disfavored torts; that is especially true of those that threaten the free exercise of important rights such as speech and press. Viewed from this perspective, summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendant. As Judge Wright observed in Washington Post Company v. Keogh [365 F.2d 965 (D.C. Cir. 1966), *cert. denied,* 385 U.S. 1011 (1967)], a libel action against a newspaper:

that state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone

---

[2]In fairness to the defendants, they were given the right to file a response thereto.

if courts too restrictively viewed their power. * * * In the First Amendment area, summary procedures are even more essential.
Therefore, unless plaintiff can produce some affirmative evidence to indicate that malice existed, summary judgment may well be granted in these cases.

(Footnotes omitted.) 10A C. Wright, A. Miller & M. Kane, *Federal Practice* § 2730, at 242–45 (2d ed. 1983). We agree.

Based on the foregoing, we hold that as a matter of law there is no genuine issue as to a material fact within the contemplation of CR 56(c) and that the defendants are entitled to a judgment of dismissal.

The order denying the defendant's motion for summary judgment is reversed and the case is dismissed.

DURHAM, C.J., and WILLIAMS, J., concur.

Reconsideration denied April 17, 1984.

Review denied by Supreme Court July 24, 1984.