[No. 53737–2.   En Banc.   July 15, 1988.]

NEIL MARGOLES, *Respondent,* v. JAMES HUBBART,
ET AL, *Petitioners.*

*Witherspoon, Kelley, Davenport & Toole, P.S.,* by *Duane M. Swinton* and *Michael D. Currin,* for petitioners.

*Powell & Morris, P.S.,* and *Brian C. Balch,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

This defamation case involves a public official plaintiff and news media defendants. At issue is whether the evidence presented at the summary judgment stage of the case raised a triable issue of fact on the element of actual malice.

The plaintiff, Neil Margoles, was port manager of the Port District of Pend Oreille from November 1, 1978 until his resignation on March 31, 1982. On December 17, 1981, December 24, 1981 and April 8, 1982, the Newport Miner, a Newport, Washington newspaper, published articles by reporter James Hubbart that were highly critical of the port manager and the financial affairs of the port district. The articles dealt with the results of a port district audit conducted by the State Auditor.

The December articles were based on a preliminary audit report not generally available to the public. The April 8 article was based on the final and public audit report issued April 2, 1982. Among other things, the final report discussed "deficiencies" in the port manager's claims for reimbursement of travel and promotional hosting, and the salary he received for time he had spent working as a consultant for the Port of Beverly–Royal Slope. This audit report had bluntly declared that "[t]he deficiencies noted were the result of the manager failing to comply with State statutes and local regulations."

The port manager sued the reporter and his marital community, as well as the newspaper publisher, Newport Publications, Inc. For convenience, we will collectively refer to these defendants as "the newspaper" and the plaintiff as

"the port manager" even though he no longer occupies that position. Although the port manager also named Bettyjane Hillestad, the Pend Oreille County Auditor and the source of some of the information in the articles as a defendant, she is not a party to this appeal.

The port manager takes issue with a rather broad array of statements contained in the three newspaper articles. Those which he apparently considers to be particularly defamatory are those portions of the articles stating or suggesting that he: (1) made unauthorized private use of the port's vehicle; (2) submitted a letter of resignation on condition that he be held blameless for improprieties in the port's internal affairs; (3) received funds "funneled" to him through a company owned by his wife; (4) "misappropriated" $294 in port funds; and (5) charged the port district for time spent working for another port district.

The newspaper moved for summary judgment on the issue of liability. The trial court declined to dismiss the port manager's action outright. The trial court did, however, grant partial summary judgment in favor of the newspaper to the extent that it ruled the port manager was a public official during his tenure as port manager, a ruling which is not here questioned. The newspaper sought discretionary review in the Court of Appeals. That court granted review and in a published opinion affirmed the general denial of a summary judgment.[1] Relying on the alleged hostility between the reporter who wrote the articles and the port manager, and on the articles' use of the words "funneled" and "misappropriated" to describe transactions concerning the port manager, the Court of Appeals held that there was an inference creating a material issue of fact as to whether the statements were published with actual malice.[2] We granted discretionary review.

One ultimate issue is presented.

---

[1] *Margoles v. Hubbart*, 46 Wn. App. 832, 733 P.2d 554 (1987).

[2] *Margoles*, at 835.

## ISSUE

In this defamation suit, did the Court of Appeals err when it upheld the trial court's ruling generally denying the newspaper's motion for summary judgment?

## DECISION

CONCLUSION. We conclude that the Court of Appeals did err in ruling that the use of the words "funneled" and "misappropriated", combined with the claimed hostility between the reporter and the public official, created a material issue of fact as to whether the newspaper published the statements in question with knowledge of their falsity, or with reckless disregard of whether they were false or not. Viewing the evidence in the light most favorable to the port manager, as we do, we nevertheless hold that on the record presented no rational trier of fact could find "clear and convincing evidence" that the articles under scrutiny were made with actual malice, as is required in order to establish a prima facie defamation cause of action.

■ The determinative law is now well settled in this state. In order to establish a prima facie defamation case, a plaintiff must show falsity, an unprivileged communication, fault and damages.[3] When the plaintiff is a public official, as here, the fault to be proved is "actual malice".[4] In this context, "actual malice" means that the statement was made with knowledge of its falsity or with reckless disregard of whether it was false or not.[5] Recently, and subsequent to the decisions of both the trial court and the Court of Appeals in this case, we decided *Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 169–70, 736 P.2d 249 (1987), which collects the legal principles pertinent to the case before us:

[3]*Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982).

[4]*New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964).

[5]*New York Times*, at 280. *See also Tilton v. Cowles Pub'g Co.*, 76 Wn.2d 707, 722–25, 459 P.2d 8 (1969), *cert. denied*, 399 U.S. 927 (1970).

The standard of review on appeal of a summary judgment order is de novo, with the reviewing court performing the same inquiry as the trial court. *See Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986); *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985).[6] Evidence not presented before the trial court is not considered on appeal. *See Tank v. State Farm Fire & Cas. Co.,* 105 Wn.2d 381, 390, 715 P.2d 1133 (1986).

When a defamation claim is brought by a public official regarding statements made about the official's performance of his public duties, the plaintiff must prove that the statements were made with actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). The burden of proof for the element of actual malice is "clear and convincing evidence", not the less stringent "preponderance of the evidence" burden ordinarily required in civil suits. *New York Times,* at 285–86. This heavier burden is imposed at the summary judgment stage as well as at trial; *to survive a defendant's summary judgment motion for dismissal, the plaintiff must offer evidence sufficient to permit a reasonable trier of fact to find clear and convincing proof of actual malice. Anderson v. Liberty Lobby, Inc.,* [477] U.S. [242], 91 L. Ed. 2d 202, 215, 106 S. Ct. 2505 (1986). As with other summary judgment motions, the nonmoving party is entitled to have the evidence viewed in a light most favorable to him and against the moving party. *Liberty Lobby,* 91 L. Ed. 2d at 216. However, if the plaintiff, as nonmoving party, can only offer a "scintilla" of evidence, evidence that is "merely colorable", or evidence that "is not significantly probative", the plaintiff will not defeat the motion. *See Liberty Lobby,* 91 L. Ed. 2d at 212; *cf. Rye v. Seattle Times Co.,* 37 Wn. App. 45, 56, 678 P.2d 1282, *cert. denied,* 469 U.S. 1087 (1984). Moreover, conclusory statements in a plaintiff's affidavit are insufficient; the plaintiff must demonstrate the basis for his assertions. *Mansfield v. Holcomb,* 5 Wn. App. 881, 886–87, 491 P.2d 672 (1971). *The inquiry before this court, then, is*

[6]*See also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, *reh'g denied,* 467 U.S. 1267 (1984), which emphasized the need for independent review in defamation cases.

*whether, in viewing all the evidence in a light most favorable to the [plaintiffs], a reasonable trier of fact could find clear and convincing proof that the defendants published their articles with actual malice.*

(Footnote omitted. Italics ours.)

The actual malice standard is subjective in the sense that it focuses on the media defendant's knowledge that the defendant's statement is false or made with reckless disregard of its falsity.[7] Thus, a public official plaintiff must show that a media defendant "*in fact* entertained serious doubts as to the truth of his publication." (Italics ours.) *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968).[8] Clear and convincing proof of actual malice cannot be established solely by evidence of personal hostility, vindictiveness or spite.[9] However, when reviewing the record the court will consider cumulatively such factors as hostility, knowledge that sources are hostile to the plaintiff, failure to investigate, and use of unreliable sources to determine whether a clear and convincing inference of actual malice has been raised.[10]

With the foregoing principles in mind, we turn to the evidence in this case. For clarity of analysis, we individually examine the principally disputed statements, keeping also in mind their cumulative effect.

In support of the newspaper's motion for summary judgment, the reporter's affidavit stated that he had "personally ascertained" the facts and that he believed all of the facts

---

[7]*Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 170, 736 P.2d 249 (1987); *Herron v. KING Broadcasting Co.*, 109 Wn.2d 514, 523, 746 P.2d 295 (1987), *reh'g granted* July 12, 1988. *See also* R. Smolla, *Defamation* § 3.14[1] (1986).

[8]Quoted in *Herron v. Tribune Pub'g Co.*, *supra* at 171; *Herron v. KING Broadcasting Co.*, *supra* at 523.

[9]*Herron v. KING Broadcasting Co.*, *supra* at 523–24; *McDonald v. Murray*, 83 Wn.2d 17, 19, 515 P.2d 151 (1973); *see also* R. Smolla § 3.16.

[10]*Herron v. Tribune Pub'g Co.*, *supra* at 172; *Herron v. KING Broadcasting Co.*, *supra* at 524–25; *see also Rye v. Seattle Times Co.*, 37 Wn. App. 45, 54, 678 P.2d 1282, *review denied*, 102 Wn.2d 1004, *cert. denied*, 469 U.S. 1087 (1984).

in the first two articles to be true, and all of the facts in the third article to be substantially true. Such professions of good faith are unpersuasive if "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."[11]

Opposing the motion for summary judgment, the port manager filed his affidavit and two depositions, an affidavit of port commissioner John J. McLaughlin, the State Auditor's final report and other miscellaneous documents.[12]

First, considering the issue of whether the port manager made unauthorized private use of the port district's vehicle, we note that the December 17, 1981 newspaper article said that the preliminary "audit report . . . *apparently* . . . embraces . . . private use of the port's vehicle . . ." (Italics ours.) The December 24, 1981 article then said that "unauthorized use of the port's vehicle ceased to be a problem this week. The 1979 Blazer was in the shop with a blown engine because somebody let it run out of oil."

According to the port manager, the preliminary audit report did not discuss private use of the port's vehicle, and he was fairly certain the reporter had a copy of that report. Since the port manager admits, however, that he was cautioned by the port commissioners after one incident not to make unauthorized use of the port vehicle, we cannot conclude that the statement was published with knowledge of its falsity or with reckless disregard of its truth or falsity. Accordingly, actual malice was not clearly and convincingly established on the basis of statements as to the unauthorized use of the port vehicle.[13]

---

[11]*Herron v. Tribune Pub'g Co., supra* at 172, quoting *St. Amant v. Thompson,* 390 U.S. 727, 732, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968).

[12]Although the preliminary audit report and the depositions of the reporter and the State Auditor have now been filed, those materials were not considered by the trial court and, therefore, may not be considered on appeal. *Tank v. State Farm Fire & Cas. Co.,* 105 Wn.2d 381, 390, 715 P.2d 1133 (1986); *Herron v. Tribune Pub'g Co., supra* at 169.

[13]*See New York Times,* at 279–80.

■ Turning to the matter of the port manager's letter of resignation, the December 24 article said that "district manager Neil Margoles submitted a letter of resignation, effective March 31, on condition that he be held blameless for any improprieties in the port's internal affairs." The April 8 article contained a similar statement. The actual paragraph from the port manager's letter of resignation so referred to reads as follows:[14]

> The Board of Commissioners, upon accepting this resignation pursuant to their demands, acknowledge that termination is not based on misconduct or misrepresentation on my part, but is desired to effect a change of direction in Port policy and attitude and for which the Commissioners believe a change of management can better induce.

This same paragraph was also quoted later in the December 24 article. It cannot be said that the article incorrectly characterized the effect of the letter, let alone that there is any indication of actual malice in connection with it. When a defamatory statement is true, no actual malice exists.[15]

■ As to the next controverted item, the use of the word "funneled" in one of the articles, the Court of Appeals concluded that this amounted to significant evidence of actual malice.[16] We disagree. The December 24 article reads: "At least $12,750 was funneled to him through a company called Thomas Contracting, evidently by consent of the port commissioners." The Port of Beverly–Royal Slope paid money for consultant fees to Thomas Contracting, which in turn paid the port manager. Also, according to the article, the port manager's wife was the president of Thomas Contracting. "Funnel" means "to serve as a means

---

[14]Exhibit 4, First Deposition of Margoles.

[15]*Driscoll v. Block,* 3 Ohio App. 2d 351, 366, 210 N.E.2d 899 (1965); *Bell v. Courier–Journal & Louisville Times Co.,* 402 S.W.2d 84, 87 (Ky. 1966); *Fendler v. Phoenix Newspapers Inc.,* 130 Ariz. 475, 480, 636 P.2d 1257 (Ct. App. 1981). *See generally* R. Smolla § 5.08.

[16]*Margoles v. Hubbart,* 46 Wn. App. 832, 835, 733 P.2d 554 (1987).

for the transmission or direction of".[17] We fail to see anything in the record which establishes that the use of the word "funneled" in this context is even false. In any event, the "sting" of the reporter's story is true.[18]

The Court of Appeals also considered the use of the word "misappropriated" particularly significant in this case.[19] As to this, the April article said:

A final report by the state examiners contains a laundry list of irregularities and discrepancies in expense account vouchers and other payments to Margoles. It even states that he owes the port a refund of at least $294 in misappropriated funds.

In the State Auditor's final report, it was recommended that the port manager reimburse $293.94 to the port for 24 hours of time he had been paid by the Port of Pend Oreille and which the auditor questioned. The auditor in effect opined that the hours should have been billed to the Port of Beverly–Royal Slope, for which the port manager also acted as consultant. The Board of Commissioners disagreed with the auditor's recommendation that the port manager reimburse the port and this the article duly noted.

As with "funneled", using the word "misappropriated" in this context appears to be no more than a highly critical way of describing what the auditor's final report said. The First Amendment permits "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964).[20] Absent significant probative evidence of actual

---

[17]*Webster's Third New International Dictionary* 922 (1971).

[18]*See Mark v. Seattle Times*, 96 Wn.2d 473, 494, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982); *Herron v. KING Broadcasting Co., supra* at 522.

[19]*Margoles*, at 835.

[20]*See also Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir.) ("an adversarial stance is fully consistent with professional, investigative reporting."), *cert. denied*, ___ U.S. ___, 98 L. Ed. 2d 151, 108 S. Ct. 200 (1987).

malice, the use of the word "misappropriated" in this context is not actionable.

The last of the principally disputed statements in the newspaper is the comment that the final audit report "found four instances in which [the port manager] was paid by both port districts for the same work and indicated that there could have been more." The final audit report does in fact question four instances of time charged to the Port of Pend Oreille that the auditor thought, particularly in at least three of those instances, were more properly chargeable to the Port of Beverly–Royal Slope. Then, as the auditor's report concludes:[21]

> Additionally, due to the lack of records, we cannot totally identify if any time was double charged by the manager to the Port of Pend Oreille and the Port of Beverly–Royal Slope.

Following his reportorial style, the reporter used the foregoing as a quotation immediately after his own characterization of the auditor's report. The article thus presented the reader with both a completely accurate version, and one perhaps somewhat colored version, of those particular facts. Even assuming some falsity of this statement to have been demonstrated by the final report, again the port manager does not present significantly probative evidence of any actual malice on the newspaper's part. As we recently made clear in the Tacoma News Tribune case,

> The public figure's critics have no affirmative duty to search out the truth or to substantiate their statements, nor are they required to corroborate their sources' information. The only limitation on free expression is liability imposed for false and damaging statements made with actual knowledge of or in reckless disregard of their falsity.

*Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 171, 736 P.2d 249 (1987), citing *Garrison v. Louisiana,* 379 U.S. 64, 79, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964).

---

[21]Exhibit 9, First Deposition of Margoles, at 3.

Whether viewed separately or cumulatively, neither the foregoing statements nor the others referred to by the port manager in his brief constitute proof of actual malice by the requisite "clear and convincing" standard. The newspaper articles in this case are a far cry from being "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant v. Thompson,* 390 U.S. 727, 732, 20 L. Ed. 262, 88 S. Ct. 1323 (1968), quoted in *Herron v. Tribune Pub'g Co., supra* at 172. No rational trier of fact could find by clear and convincing evidence that the articles in question, in whole or part, were published with reckless disregard of their truth or falsity.

Finally, there are two prior opinions of this court that require comment though both are distinguishable from the present case.

In *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973), this court found sufficient evidence of actual malice to defeat the defendant's motion for summary judgment. That case is distinguishable on the facts.

In *Chase,* a commissioner for the Kittitas County Port District sued a newspaper concerning an article which, as it happens, was also written about a port district audit. The audit recommended that the commissioner repay money to the port district because it said he had been reimbursed for a trip he never took. In point of fact, the commissioner had received no such reimbursement. Instead, legal counsel had advised him that paying the money would be less expensive than fighting it in court, so the commissioner paid it. Before publishing its story on the repayment, however, the newspaper had known the true facts, yet published the story anyway and without mentioning the commissioner's denial that he had ever received the funds in question. This court held that since the newspaper *knew* this from the commissioner's statement to the managing editor, the article created a false impression of his defalcation of public moneys. Accordingly, it was held that the commissioner had made out a case of actual malice with convincing clarity

and that his case against the newspaper should have been allowed to go to the jury.[22]

The evidence of actual malice is far less clear here than it was in *Chase*. The most questionable of the published statements complained of in this case is probably the reference to the four instances in which the port manager double charged the port districts, and which the reporter attributed to the final audit report. While the story somewhat colored the language of the final report, the report's actual language, which was quoted later in the same article, is such that it does sustain an interpretation that some double charging may have occurred.

The case before us is also distinguishable from our recent decision in *Herron v. KING Broadcasting Co.*, 109 Wn.2d 514, 746 P.2d 295 (1987), *reh'g granted* July 12, 1988. There, a majority of this court concluded that under the facts of that case a county prosecuting attorney had presented "abundant"[23] circumstantial evidence of actual malice in his action against a television news reporter and television broadcast company, and that it was sufficient to get past a defense motion for summary judgment. That case and the case before us have as a common denominator allegations of hostility between the reporter and public official, including a claimed threat "to get" the public official. But for a public official to claim, as here, that a reporter said "I'll get you" or words to that effect, is not by itself a safe conduct pass past a defense motion for summary judgment in a defamation action. A reporter can "get" somebody, to use the vernacular, by telling the truth as well as by resorting to defamation.

■ As recently explained by the full District of Columbia Circuit Court of Appeals in *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir.), *cert. denied*, ___ U.S. ___, 98 L.

---

[22]*Chase v. Daily Record, Inc.*, 83 Wn.2d 37, 38–39, 44–45, 515 P.2d 154 (1973).

[23]*Herron v. KING Broadcasting Co.*, 109 Wn.2d 514, 525, 746 P.2d 295 (1987), *reh'g granted* July 12, 1988.

Ed. 2d 151, 108 S. Ct. 200 (1987), in affirming the trial court's dismissal of a plaintiff's libel action wherein the reporter had threatened "to get" the plaintiff:

These statements, not unknown to the vernacular of litigators, seem to us well within the everyday parlance of an *investigative* reporter. They may reasonably be interpreted as revealing that [the reporter] had adopted an adversarial stance toward [the plaintiff]. But, as in other professions, an adversarial stance is fully consistent with professional, investigative reporting. It would be sadly ironic for judges in our adversarial system to conclude, . . . that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts. We decline to take such a remarkable step in First Amendment jurisprudence.

*Tavoulareas,* at 795. As *Tavoulareas* also explained,

It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice. . . . The appropriateness of such evidence must be determined on a case–by–case basis, bearing in mind that evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith.

(Footnote and citations omitted.) *Tavoulareas,* at 795. We hold here, as the court held in *Tavoulareas,* that "[t]he ill–will or bad–motive evidence in this record . . . is lacking in probative value." *Tavoulareas,* at 795. *See Herron v. Tribune Pub'g Co., supra* at 169–70.

In *Herron v. KING Broadcasting Co., supra,* it was the majority's opinion that the evidence in that case indicated that there were factual issues as to whether the media defendants disregarded information in official reports that had been read, relied on questionable sources and destroyed evidence. That is not present in the case before us.

Viewing the evidence herein in the light most favorable to the plaintiff port manager, we hold that a reasonable trier of fact could not find clear and convincing proof that

the newspaper published the articles in question with actual malice.

The remaining matters argued in the briefs have been considered but are deemed nonmeritorious. For example, as to the allegedly defamatory statements concerning so-called "secret" files of the port district, the port manager presents evidence of falsity, but no evidence whatsoever of actual malice, much less the required evidence of convincing clarity.

The order of the trial court denying the motions for summary judgment of dismissal by the defendants Hubbart and Newport Publications, Inc., and the decision of the Court of Appeals, are hereby reversed.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, CALLOW, and DURHAM, JJ., concur.

DORE, J. (dissenting)—I cannot join in a defamation decision which ignores a number of the defaming statements complained of, sidesteps crucial facts bearing on those statements which it does discuss; and misapplies the law. In key respects this case is indistinguishable from the recent case of *Herron v. KING Broadcasting Co.*, 109 Wn.2d 514, 746 P.2d 295 (1987), *reh'g granted* July 12, 1988, in which we found a jury question of malice. The decision of the lower courts should be affirmed.

### STATEMENTS REGARDING SECRET PORT DISTRICT FILES

The majority opinion ignores altogether two statements which Margoles has contended are defamatory. This is a serious omission since, if we construe the evidence favorably to Margoles, as we must on summary judgment, the statements are false and were known to be false. The article of December 17, 1981 contains the following statement:

> Early this year, at the behest of Margoles and McLaughlin, the port hired its own auditor . . . and began in-house bookkeeping under the supervision of Margoles.

Requests by The Miner for access to port records have been regularly refused ever since.

Exhibit 1. In his affidavit submitted to the trial court, Margoles asserted:

The article stated that requests by the Newport Miner for access to port records "have been regularly refused ever since" is completely false [sic]. Since I was manager of the Port District, I believe this allegation was libelous of me.

Clerk's Papers, at 62. The December 24, 1981 article stated:

Files heretofore kept secret showed that Margoles collected more than $60,000 in salary plus expenses from the Port of Pend Oreille and from another port district during 1980 and 1981.

Exhibit 2. Even aside from the allegation concerning $60,000, Margoles has contended that the assertion that certain port district files were kept secret is false and defamatory. Clerk's Papers, at 62, 64. Margoles' contentions are not frivolous. The Miner's articles suggested that a state audit had uncovered wrongdoing by Margoles. The newspaper's further assertions that it was denied access and that certain records had been kept secret suggest that the wrongdoing was compounded by a cover–up. The majority, however, discusses neither of these alleged defamations.

Both statements present a jury question of malice. On summary judgment, we take the facts asserted in Margoles' affidavit to be true and ask whether a jury could reasonably find in his favor. *Herron v. KING Broadcasting Co., supra* at 525. We assume, therefore, that the Miner's request for port records was not refused or that no such request was made. Likewise, we assume that, as Margoles swore, no port district files were kept secret. If that is so, then Hubbart's statements are false and a question of fact is presented for the jury. In addition, Margoles' affidavit logically implies that Hubbart's statements were made with actual knowledge of their falsity. It would have been Hubbart who sought the port district records. If we take Margoles' contentions as true, as we must, then Hubbart would have to

have known that no such requests were made or that his requests were granted. A jury question is thus presented on the issue of actual knowledge of falsity. Such knowledge would constitute malice under *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). Therefore summary judgment should be denied on that issue.

The majority's failure to consider the allegedly defamatory statements on port authority records is inexcusable. The majority deems the claim based on these statements "nonmeritorious" on the ground that Margoles' affidavit does not present evidence of convincing clarity. That conclusion can only be reached by a willful misunderstanding of the convincing clarity standard.

A plaintiff in a case such as this is required to prove the elements of defamation, including malice, by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) holds that the same high standard is applicable in the court's consideration of summary judgment. *Anderson,* however, clearly does not require the grant of summary judgment with regard to the statements regarding secret files and the withholding of information.

Neither Margoles nor Hubbart offered documentary evidence on this issue; each side submitted only affidavits. Only live testimony can establish whether Margoles or Hubbart is telling the truth. While Margoles is required to show malice with convincing clarity, an extreme discrepancy in the respective credibility of Margoles and Hubbart could lead the jury to find clear and convincing evidence of Hubbart's knowingly making a false statement *in the oral testimony alone.* We have, then, a classic jury question in which credibility is decisive. *Anderson* does not change the rule that credibility is for the jury. In fact, the Court took pains to stress that its holding should not be construed to limit the jury's function or to expand the role of the court in deciding questions of fact in defamation cases.

Our holding that the clear–and–convincing standard of proof should be taken into account in ruling on summary

judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. *Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,* not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non–movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

(Citation omitted. Italics mine.) *Anderson,* at 255. Therefore, Margoles' affidavit is sufficient evidence on which to conclude that summary judgment is inappropriate. A question of fact is presented on the issue of Hubbart's malice in publishing the statements that the Miner had been denied access to port district files and that port district records had been kept secret. Summary judgment should be denied and the case remanded for trial.

STATEMENTS REGARDING "MISAPPROPRIATED" AND "FUNNELED" FUNDS

In the December 24, 1981 article, Hubbart reported: "At least $12,750 was funneled to [Margoles] through a company called Thomas Contracting, evidently by consent of the port commissioners." Margoles' affidavit states:

The article [of December 24, 1981] further states that at least $12,750 was "funneled" to me. No money was funneled or inappropriately paid to me. The money was paid to a company that I worked for and in return I received pay from that company. . . .

In the April 8, 1982 articles Hubbarts [sic] stated that I owed the Port District a refund of at least $294 in misappropriated funds. That is not true. The article states that the state audit found four instances in which I was paid by two port districts for the same work and indicated there could have been more. That was completely false.

Clerk's Papers, at 62–63. In the April 8, 1982 article, Hubbart reported: "[The audit] even states that he owes the

port a refund of at least $294 in misappropriated funds." This "misappropriated" $294 was a portion of Margoles' salary which the auditor thought should be deducted from his pay. It was said to represent time spent working as a consultant for another port district. The April 8, 1982 article also represents the audit as reporting three other instances in which Margoles allegedly received payment from Pend Oreille Port District for work performed for another district.

The majority concludes that there could have been no malice—no knowing falsity or recklessness—in regard to these statements because they were not materially false.

> We fail to see anything in the record which establishes that the use of the word "funneled" in this context is even false. In any event, the "sting" of the reporter's story is true.
>
> . . .
>
> As with "funneled", using the word "misappropriated" in this context appears to be no more than a highly critical way of describing what the auditor's final report said.

Majority, at 203. We explained what it means to say the "sting" of a story is true in *Mark v. Seattle Times,* 96 Wn.2d 473, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982), and *Herron v. KING Broadcasting Co., supra.* Contrary to the majority's suggestion, it does *not* mean that a statement is not materially false, despite misleading wording, so long as the underlying facts are true. The question is whether an article containing falsehoods, *taken as a whole,* leaves a false impression. The majority has misapplied the law by breaking the offending articles down into isolated statements and analyzing these fragments separately for falsity and malice. Prior case law clearly requires us to analyze the statements as a whole, taking into effect their total effect. The majority claims that it keeps the cumulative effect in mind, but there is no sign that it does; the majority ignores and negates that effect.

In *Mark,* the newspaper and other defendants correctly reported plaintiff was charged with larceny, but reported an incorrect, inflated figure for the amount involved. Mark

contended that this defamed him. We disagreed, holding that each of the stories, taken as a whole, was true and that the falsehood of the figure did not render any of the stories, taken as a whole, untrue.

It is now generally agreed that a defamation defendant need not prove the literal truth of every claimed defamatory statement. W. Prosser, *Torts* 798 (4th ed. 1971). A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the "sting", is true. W. Prosser, *supra.*

*Mark,* at 494.

We examined the offending report as a whole in the recent case of *Herron v. KING Broadcasting Co., supra.* There, the defendant reported correctly that the plaintiff was under investigation concerning bail bond practices; that his close friend was a bail bondsman; and that he had accepted substantial sums from a bondsman to finance his campaigns. The trial court concluded that the further, false statement that plaintiff received "approximately half" of his funds from bail bondsmen did not alter the "sting" of the story and that it was therefore not materially false. We reversed.

Herron assigns error to the trial court's characterization, contending that the true "sting" was to implicate Herron in a criminal conspiracy, giving an overall impression that he bargained away his ethics and integrity in exchange for campaign contributions. We agree. In that context, the statement that "approximately half" of Herron's campaign contributions came from bail bondsmen carries significantly greater opprobrium than the more accurate figure: approximately 2 percent. The false statement thus affected the "sting" of the story itself. Herron has made a sufficient prima facie showing of material falsity to preclude summary judgment.

*Herron v. KING Broadcasting Co., supra* at 523. *See also Camer v. Seattle Post–Intelligencer,* 45 Wn. App. 29, 38–39, 723 P.2d 1195 (1986) (statement's status as opinion or fact to be determined by examining the report as a whole), *review denied,* 107 Wn.2d 1020, *cert. denied,* 482 U.S. 916, 96 L. Ed. 2d 677, 107 S. Ct. 3189 (1987).

If the defendant need not prove the literal truth of every claimed defamatory statement, by what standard of fairness can we require the plaintiff making a prima facie case to prove the falsity of each separate statement and, in addition, motivating malice behind each separate statement? Isn't it proper, rather, to look at the defamatory report as a whole when asking whether the plaintiff has carried his burdens, just as we look at the defamatory report as a whole when asking whether the defendant has carried his? Apparently assuming that the answer is no, the majority examines only isolated statements in the articles written by Hubbart, requiring Margoles to show falsity and malice in regard to each one. That virtually ensures that summary judgment will be granted, but it contradicts settled law and ignores the reality of how these articles affected the public that read them.

The statements regarding "misappropriated" and "funneled" funds should not be analyzed in isolation for their falsity and the malice that might have motivated them. Instead, given that the article does contain falsehoods, the words are relevant to determining whether the article, taken as a whole, leaves a false impression. Do the statements regarding "misappropriated" and "funneled" funds contribute to the impression that Margoles was engaged in misuse of public funds?

It seems obvious to me, as it did to the Court of Appeals, that those statements do contribute to a false impression. There is a tremendous difference between saying that Margoles may have been overpaid and saying that he has received misappropriated funds. The word misappropriated clearly implies malfeasance, where in fact what the audit showed was a disagreement over the calculation of Margoles' salary. That false impression was reinforced later in the article, when it was reported that the commissioners "would not seek restitution." In fact, the commissioners disagreed with the auditor's interpretation of the figures and rejected altogether the suggestion that Margoles was not entitled to the money he had received. To say that the commissioners "would not seek restitution" conveys the

entirely different impression that Margoles had received funds to which he was not entitled, but that the commissioners had decided not to go to the trouble of recovering them. Once again, it is not the isolated word choice which is to be evaluated separately for falsity and malice. Instead, the use of "restitution" like the use of "misappropriated" makes the "sting" of a story containing both truth and falsehood tilt toward the false.

The same is true of the word "funneled". As the majority points out, the dictionary meaning of the verb "to funnel" is innocuous. But this article used the word in a specific context, one full of innuendo and actual falsehood. While "funneled" might mean "to serve as a means for the transmission or direction of" when encountered in isolation, here it clearly implied concealment and dishonesty. That implication pushes the truth contained in the article into a false light. The "sting" of the story is false, though it contains true statements.

### Hubbart's Threats

The majority makes a similar error in not taking into account the full factual background of the alleged defamations. It fails to give due weight to Hubbart's threats against Margoles. Malice in the context of defamation cases does not mean hatred or ill will, but rather knowledge of falsity or reckless disregard of falsity. Nevertheless, evidence of hostility or spite is clearly relevant in determining whether a defendant was inclined to act with such knowledge or recklessness. As we held in *Herron v. KING Broadcasting Co., supra*:

> The standard for determining "actual malice" is subjective, focusing on the defendant's belief in or attitude toward the truth of the statement, not the defendant's personal hostility toward the plaintiff. However, actual malice can be inferred from circumstantial evidence, including defendant's hostility or spite, the reporter's knowledge that his sources are hostile to the plaintiff or ignorant of the details concerning the situation in question, destroying notes after the complaint is served, failure to follow newspaper procedures for filing papers of inaccuracy, and failing to properly investigate.

(Citations omitted.) *Herron,* at 523–24. Evidence of hostility was critical to our decision in *Herron v. KING Broadcasting Co., supra.*

> Here, viewing the evidence in the record in a light most favorable to Herron, there is abundant circumstantial evidence of actual malice. McGaffin's exchange with Deputy Prosecuting Attorney Sebring was extremely hostile. McGaffin threatened to "get" Herron or his staff in a story he intended to broadcast on the evening news because he was angry at their failure to cooperate with his investigation. He then in fact did broadcast a story casting the prosecutor's office and specifically Herron in a very evil and criminal light in a story that contained inexplicable falsehoods. In addition, the general tenor of the story is hostile and even implies that Herron arranged court records to hide his illegal activities. *See Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2d Cir. 1969) (innuendo can be indicative of actual malice).

*Herron,* at 525. The similarities to this case cannot be ignored. Not only did Hubbart make a similar suggestion that a public official had concealed the public records of his activities; he also made similar overt declarations of hostility and an intention to use his position to "get" Margoles. The affidavit of John McLaughlin, a port commissioner, sets forth the facts in detail:

> During the fall and winter of 1981, other port district commissioners and I had discussions with James Hubbart concerning Neil Margoles and the operation of the port district. Mr. Hubbart made it very clear that he wanted to see Neil Margoles fired.
>
> On December 11, 1981, at approximately 4:30 p.m., one other port commissioner, Franklin Billings and I, met with James Hubbart and Sherry Hubbart in the editor's office of the Newport Miner. The purported purpose for that meeting was to discuss the preliminary port district audit. Mr. and Mrs. Hubbart stated that they had reviewed the port audit and *demanded that the resignation of port manager Neil Margoles be on James Hubbart's desk by Monday, December 14, 1981, or they would go hard on the port district and write about port affairs in the worst possible light.*

As nearly as I can tell, Hubbart['s] antagonism towards Neil Margoles began in approximately October, 1979, when the Newport Miner had set up a meeting at a business called the Ranch Club located between Priest River and Newport. That meeting was to be a luncheon with a man named Porteous. Mr. Porteous was a representative of a company called "Toy Pack". Toy Pack was considering construction of a very large mill which would mean a large infusion of capital and jobs into Pend Oreille County. Hubbarts [sic] planned to pay for that luncheon meeting, and in exchange the Miner was supposedly to get the scoop on any story. A reporter, from a competing newspaper in Priest River, was at that luncheon. After lunch, James Hubbart came to my office. He was livid and blamed Margoles for the reporter's presence. He shut the door and told me that Neil Margoles had stepped on his toes; that "this was my baby". *He further stated that he was going to get Neil Margoles even if he had to use the newspaper to do it.*

(Italics mine.) Clerk's Papers, at 55–56. These threats are clearly relevant, though not conclusive, on the issue of malice. They indicate that Hubbart may have been disposed to falsity or reckless disregard for the truth. On this motion for summary judgment, Hubbart's stated willingness to "write about port affairs in the worst possible light" does not permit us to conclude, as the majority does, that Hubbart meant to "get" Margoles simply by vigorous investigation and careful reporting of the truth. Once again, the majority weighs evidence drawing that conclusion. The similar events and threats in *Herron v. KING Broadcasting Co., supra,* led us to conclude that a jury question was presented on the issue of malice. Given the other evidence in this case, the same conclusion seems inescapable here.

### MISUSE OF THE PORT DISTRICT VEHICLE

The article of December 17, 1981 stated that:

The audit report will not be made public for at least eight weeks, but apparently it embraces questionable expense accounts, unexplained payouts, private use of the port's vehicle and faulty bookkeeping.

The majority acknowledges that the preliminary audit report did not discuss misuse of the port district vehicle at

all. The majority stresses the use of the word "apparently" in this passage, and fails to find either falsity or malice in connection with it. However, Commissioner McLaughlin's affidavit, which on summary judgment we take as true, bars such an interpretation. McLaughlin swears that Hubbart personally told him that he, Hubbart, had read the preliminary report. Furthermore, McLaughlin saw Hubbart read from a document he believed to be the preliminary report in the meeting held on December 11, 1981. These latter facts demonstrate that Hubbart knew his statement was false when he incorrectly reported that the preliminary report contained allegations concerning the port vehicle. The use of the word "apparently" is simply disingenuous and does not change the fact that the report was knowingly false. Hubbart knew what the report in fact contained.

The majority not only ignores these facts, its reasoning on this point is a non sequitur.

> Since the port manager admits, however, that he was cautioned by the port commissioners after one incident not to make unauthorized use of the port vehicle, we cannot conclude that the statement was published with knowledge of its falsity . . .

Majority, at 201. The fact that Margoles admitted to a warning on a matter not dealt with in the preliminary report has no bearing on the question of malice. Hubbart may or may not have had information on such misuse, but when he portrayed the preliminary report as containing such allegations, he knowingly made a false statement. Under the facts as we are bound to construe them on summary judgment, Hubbart had the report in his possession, had read it, and knew its true contents.

## CONCLUSION

The majority tries this case on appeal, choosing which facts it will consider and which side it will believe, in complete disregard of its limited role in deciding an issue of summary judgment. Margoles has submitted sufficient facts

on which a jury might reasonably conclude that Hubbart knowingly reported falsehoods.

I would deny summary judgment as the trial court and the Court of Appeals did.

GOODLOE, J., concurs with DORE, J.